Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Monday, March 16, 2009 1:50:01 PM

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LARRY GENE HOSKINS, and | ) | Case No. 08-565 |
| PAMELA JO HUBBARD HOSKINS, | ) | |
| | ) | |
| Debtors. | ) | Chapter 13 |

## MEMORANDUM OPINION

In 1998, Mr. Kungle constructed, for himself, a cabin on 15 acres of real property belonging to Larry and Pamela Hoskins (the "Debtors"). In 2004, after a dispute regarding Mr. Kungle's use of their land, the Debtors prohibited Mr. Kungle from accessing the cabin. Mr. Kungle now claims that the Debtors owe him $98,348 for the cabin, and he filed an unsecured proof of claim in the Debtors' Chapter 13 bankruptcy case in that amount. The Debtors object to the proof of claim arguing that they owe Mr. Kungle nothing, or, in the alternative, that Mr. Kungle's claim should not exceed $13,679.

For the reasons stated herein, the court concludes that Mr. Kungle has a claim against the Debtors' bankruptcy estate for unjust enrichment that, under a theory of restitution, is to be measured by the enhanced value of the 15 acre parcel of land on which the new cabin sits. The applicable date for making the valuation determination is November 7, 2004. Because the parties only established the enhanced value as of August 25, 2007, the court will set a further evidentiary hearing to determine value as of November 7, 2004.

## I. BACKGROUND

The Debtors own approximately 364 acres of rural land in Tyler County, West Virginia. On the property is a hovel, described by the parties as "the old red cabin." Over thirty years ago, Mr. Hoskins' father began allowing Mr. Kungle's family to use the old red cabin for hunting and

1

recreation purposes. Although the amount of time Mr. Kungle spent at the old red cabin varied, he would generally be there about one month per year. He would also call the Debtors in advance to alert them of his coming, and inform them about any guests that he was bringing with him. The old red cabin has no electricity or gas; it consists of a single room, a wood stove, and six bunk beds. It has an attached outhouse.

In 1997 or 1998, Mr. Kungle approached Mr. Hoskins about building a new cabin on the Debtors' property. Mr. Kungle offered to buy the 15 acre parcel on which the new cabin was to sit, but the Debtors were adamant that no part of their land be sold. The Debtors were willing, however, to execute a long term lease, and, according to Mr. Kungle, he believed that they may have offered him a life estate in the 15 acres of land.

With no formal agreement, and with nothing more than a handshake over the notion that Mr. Kungle would be allowed to build a new cabin and use it for hunting and recreational purposes, Mr. Kungle began to construct the new cabin at his own expense. The Debtors provided some raw materials for the cabin's construction, and Mr. Hoskins actively assisted Mr. Kungle with labor and other services. It soon became apparent to Mr. Hoskins, however, that the new cabin was going to be much different than the old red cabin. Unlike the old red cabin, the new cabin has a full basement, two bedrooms on the ground floor, and a large loft. The new cabin has about 1500 square feet of living space, a modern bath, and a kitchen with hickory cabinets. The new cabin is more akin to a permanent dwelling house than the hovel that served as an overnight hunting cabin. Consistent with its purpose of being a hunting and recreation cabin, it is located about 0.9 miles from the county road and is not accessible year round.

In November 1998, the new cabin was substantially complete. Concerned about the lack of a written agreement allowing for Mr. Kungle's use of the new cabin, the Debtors hired an attorney to prepare a written lease. Among other terms, the November 6, 1998, lease had a duration of 25 years, and it restricted Mr. Kungle's use of the new cabin to 15 days a month. In the Debtors' view, the new cabin was to be nothing more than a hunting/recreation cabin – like the old red cabin – and they believed that the terms of the lease were more than adequate to accommodate Mr. Kungle's anticipated use. The only amount due the Debtors under the lease was a $1 annual payment.

Mr. Kungle refused to sign the lease on the grounds that it did not contain an option to renew the lease following the initial 25 year term for an additional 25 years. Additionally, he did not like

2

the way it restricted his access to the Debtors' property. From 1998 to 2004, Mr. Kungle came and went to the new cabin as he pleased, and he often brought guests with him. Mr. Kungle's use of the new cabin, however, became a source of tension with the Debtors:

> When they were in the old cabin, they always called before they came and let us know a week in advance or something, and he got so with that [new] cabin that he would just show up. And from where my trailer sits I can't see who's going up the hollow, and I would have to go out and see who is going up the hollow to see if it was them or if it was somebody that wasn't supposed to be there. So we never knew when they were coming and we discussed that with him. We asked him to call before he came, so he started calling five minutes before he got there.
> 
> . . . .
> 
> [T]hey would run four-wheelers all hours of the day and night past the trailer. It didn't matter what time it was, midnight, 1, 2, 3:00 in the morning, and my bedroom is on that end of the trailer. I don't know if we ever discussed [it] with him, but we had a problem with the number of people he was bringing. With the old cabin, it was mostly just his family and an occasional friend, and he started bringing as many as 16 people at a time.

(Pamela Hoskins Depo. p. 68).

On September 7, 2004, the Debtors sent a letter to Mr. Kungle accusing him of taking advantage of their good nature and generosity, and of making a "mockery" of their request that he provide them with advance notice before entering their property. Among other things, the letter states that Mr. Kungle had to notify them seven days in advance if he wanted to stay overnight at the new cabin, and that the use of ATVs, trail bikes, or other equipment was prohibited. In the Debtors' view, they were the owners of the property, and everything on it; Mr. Kungle's use of their land was a privilege and not a right.

After receiving the letter, Mr. Kungle informed the Debtors that he would be at the new cabin on October 31, 2004, for an overnight stay. When Mr. Kungle came, he removed substantially all of his personal property and vacated the new cabin. Mr. Kungle stated that he did not intend to return until the dispute with the Debtors over his use of the cabin was settled.

In an effort to settle the dispute, Mr. Kungle hired an attorney and asked his attorney to contact the Debtors on his behalf. By letter dated November 1, 2004, Mr. Kungle offered to purchase the 15 acre parcel of land on which the cabin sits for $15,000. The Debtors' received the letter about a week later. Before receiving the letter, the Debtors were willing to let Mr. Kungle return to the new cabin. After receiving the letter from Mr. Kungle's attorney, however, Mr.

3

Hoskins stated that he "had no more use for him," and that Mr. Kungle could only come back to the new cabin with an appointment when he was ready to move it. Although Mr. Kungle investigated the possibility of moving the new cabin, he ultimately decided against it.

In the Debtors' bankruptcy case, which was filed on April 17, 2008, they propose a Chapter 13 plan that pays Mr. Kungle $16,752.24 as an unsecured creditor. The Debtors have substantial non-exempt equity in their real property. The Schedule A value of their 364 acres is $300,000, and the only claim secured by the value of that real property is for $50,325. Apart from Mr. Kungle, the Debtors only have one unsecured debt owed to the U.S. Department of Education in the amount of $1,346. Consequently, after deducting their applicable West Virginia bankruptcy exemptions, any Chapter 13 plan confirmed by the Debtors will have to pay Mr. Kungle 100% of his unsecured claim.

## II. DISCUSSION

Under a theory of unjust enrichment, Mr. Kungle asserts that he is entitled to recover from the Debtors the value of the new cabin, which he contends is $68,000, and, adding pre-judgment interest from 2004, he asserts that the Debtors owe him $98,348 as of May 19, 2008.

The Debtors acknowledge that the new cabin adds value to their real property, but assert that the new cabin is not worth anything to them on the basis that they would rather have the cabin removed from their property. In their view, Mr. Kungle's unjust enrichment claim should fail on the grounds that he built the cabin on the Debtors' property knowing that he did not own or have identifiable rights to their real property. Moreover, the Debtors assert that they were unaware of the scope of the new cabin; at most they believed that the old red cabin was being replaced at a cost of no more than $20,000. In the alternative, assuming that they have been enriched by the construction of the new cabin, they argue that the maximum reasonable value for Mr. Kungle's claim is $13,679, which, they contend, would be the present value of Mr. Kungle's right to use the new cabin for one month a year over his lifetime.

As stated by the Supreme Court of Appeals of West Virginia, "[t]he law of unjust enrichment indicates that if one person improves the land of another . . . through the affixation of chattels to the land, that person is entitled to restitution for the improvements if certain other circumstances are present." *Realmark Devs. v. Ranson*, 542 S.E.2d 880, 884 (W. Va. 2000) (citing *Restatement, 1st Restitution*, § 53 (1937)). As indicated by the Court, those "certain other circumstances" are the

4

ones set forth in the *Restatement 1st of Restitution*. *Id.* In general, the *Restatement* imposes a duty of restitution on any person that has tortiously interfered with the property rights of another person. *See Restatement 1st of Restitution*, §§ 128-30 (1937). The term "'[t]ortiously' refers to such wrongful conduct as gives rise to a civil action either at law or at equity . . . ." § 128 cmt. (a).

Accordingly, before determining if an award for unjust enrichment is merited, and the amount of that award, the Court must determine if the Debtors engaged in wrongful conduct that gives rise to a civil action in favor of Mr. Kungle. To make this determination, the court must first examine the legal relationship between the Debtors and Mr. Kungle, and determine if the Debtors breached a legal duty with regard to that relationship.

**A.    The Legal Relationship Between the Debtors and Mr. Kungle**

Mr. Kungle asserts that he had a life estate in the new cabin, and on the 15-acre tract of land on which it sits. The Debtors state that Mr. Kungle never had more than an oral lease for the new cabin, for which no consideration was paid to the Debtors. Contrary to both positions, no estate in land was ever conveyed to Mr. Kungle, and no lease was ever agreed-on by the parties.

Mr. Kungle had a right to access the Debtors' real property that extended back at least 30 years, but he never had any possessory interest in the Debtors' property. A right to access property without a possessory interest is a license. As defined by *Black's Law Dictionary*, 938 (8th ed. 2004), a "license" is "[a] permission, usu. revocable, to commit some act that would otherwise be unlawful; esp., an agreement (not amounting to a lease or profit a prendere) that it is lawful for the licensee to enter the licensor's land to do some act that would otherwise be illegal, such as hunting game." A license does not grant any estate in land, it is not assignable, and it is based on personal confidence between the parties. *Id.*; *see also Kelly v. Rainelle Coal Co.*, 64 S.E.2d 606, 614 (W. Va. 1951) (distinguishing a "license" from a "lease" on the grounds that license "grants to some person the right 'to do some act or a series of acts on the land of another without passing an estate in the land.'") (citation omitted), *overruled on other grounds*, *Kimball v. Walden*, 301 S.E.2d 210 (1983). A "bare license" may be revoked by the grantor at any time. *Sun Lumber Co. v. Nelson*, 106 S.E. 41, 44 (W. Va. 1921).

While a "bare license" "may ordinarily be revoked, and the licensee deprived of any right to act thereunder," the "rule is not without its limitations." *Id.* If "the license is coupled with an interest granted upon a valid consideration, such license may not be revoked, but will confer upon

5

the licensee the power to exercise the rights conferred so long as the interest to which the license is incident continues." *Id.* As stated in one treatise, "[a] license may . . . become irrevocable where the licensee makes great expenditures and permanent improvements in justifiable reliance on the licensor." 25 Am. Jur. 2d *Easements and Licenses in Real Property* § 122 (2008). Similarly, as expressed in the *Restatement 3d of Property: Servitudes*:

> If injustice can be avoided only by establishment of a servitude, the owner or occupier of land is estopped to deny the existence of a servitude burdening the land when: (1) the owner or occupier permitted another to use that land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be revoked, and the user did substantially change position in reasonable reliance on that belief . . . .

*Restatement 3d of Property: Servitudes*, § 2.10 (2000).[1]

      Mr. Kungle had a license to access the Debtors' real property for purposes of hunting and recreation. In reliance on his license, and with the consent and active assistance of the Debtors, Mr. Kungle built the new cabin with considerable effort and expense. By expending significant amounts of effort and money to build on the Debtors' property – in reliance on the Debtors' assertion that he could continue to use their property for hunting and recreational purposes – Mr. Kungle obtained a license coupled with an interest. Consequently, Mr. Kungle's license to access the Debtors' real property for purpose of hunting and recreation became irrevocable in 1998 when the cabin was constructed.

**B.     Tortious Interference with Mr. Kungle's License Coupled With an Interest**

---

[1] To illustrate the application of this Rule, the Restatement provides the following example:
> D, the developer of a tract fronting on a lake, retained ownership of a strip along the lake. The developer did not object when several owners of back lots built docks at the water line, and he specified the locations in which they were to be placed. The developer did not inform the lot owners that permission to maintain the docks might be revoked. The conclusion would be justified that D is estopped from denying that the dock owners hold the benefit of a servitude, because the nature and location of the parcel involved, the relationship of the parties, and the developer's participation in location of the docks gave the lot owners reasonable grounds for believing the permission would not be revoked.

*Restatement 3d of Property: Servitudes*, § 2.10, illus. 7 (2000).

6

Mr. Kungle maintains that the Debtors have prohibited him from entering their land so that he no longer has use of the new cabin.

According to the Debtors, Mr. Kungle was exceeding the scope of his original license to use their property for hunting and recreation by failing to properly notify them in advance of his visits, by bringing large numbers of strangers onto their property, and by excessive ATV use.

Regarding the scope of Mr. Kungle's license to use the Debtors' real property, before Mr. Kungle's construction of the new cabin, the Debtors allowed him to use the old red cabin for hunting and recreation purposes about one month per year. As stated by Ms. Hoskins, Mr. Kungle always called about a week in advance to tell them that he would be on their property. The old red cabin was used by Mr. Kungle, his brothers, and their families. Occasionally, Mr. Kungle would bring a guest. With the construction of the new cabin, both Mr. Kungle and the Debtors expected Mr. Kungle's use of the Debtors' real property to increase. While the parties never agreed on the total amount of access, the Debtors were willing to increase Mr. Kungle's right to use their property up to 15 days each month. No representations were made with regard to the number of guests allowed by the Debtors, but it is reasonable to conclude that the presence of a few guests from time to time would be tolerated, just as the presence of guests were tolerated at the old red cabin.

No indication exists in this case that Mr. Kungle stayed at the new cabin in excess of 15 days a month. Although Mr. Kungle may have exceeded the scope of his license by having as many as 16 guests at the new cabin, neither that action – nor the unwanted ATV use – would give the Debtors the right to unilaterally terminate Mr. Kungle's license coupled with an interest. Indeed, after the Debtors sent Mr. Kungle their September 7, 2004 letter complaining of his excessive use of their property, Mr. Kungle stopped the offensive conduct. Mr. Kungle's activities at the new cabin were simply insufficient to terminate his license coupled with an interest. *See generally*, *Restatement, 3d of Property: Servitudes* §§ 7.1-7.16 (2000) (setting forth the grounds on which a servitude may terminate).

After receiving the Debtors' September 7, 2004 letter outlining the terms and conditions of his use of their real property, Mr. Kungle returned and removed substantially of his personal property from the new cabin. Both Mr. Kungle and the Debtors acknowledge that Mr. Kungle was not prohibited from further use of the Debtors' property following the Debtors' September 7, 2004 letter. After receiving a letter from Mr. Kungle's attorney on or about November 7, 2004, offering

7

to settle their dispute, however, Mr. Hoskins testified:

> After he threatened to sue me, I got the letter from Steptoe & Johnson, I had no more use for him. As far as letting him come back on the property, we told him he could come back with an appointment, when he wanted to move [the new cabin], but as far as staying there, I had no intentions of letting him stay any longer.

(Gene Hoskins Depo. p. 27).

The court construes this statement to mean that Mr. Kungle was no longer allowed on the Debtors' property as of November 7, 2004.

Accordingly, the court finds that the Debtors tortiously interfered with Mr. Kungle's license coupled with an interest to use the Debtors' property, and the new cabin, for purposes of hunting and recreation. More specifically, the "certain other circumstances" making a restitution remedy appropriate are that: (1) Mr. Kungle had a license to use the Debtors' property for hunting and recreation; (2) the Debtors consented to Mr. Kungle's request to build a new cabin on their property thereby allowing him to obtain a license coupled with an interest to use their land for hunting and recreational purposes; (3) Mr. Kungle relied on the Debtors' consent when he built the new cabin; and (4) the Debtors then terminated Mr. Kungle's license coupled with an interest, without just cause, after the expenditure of considerable sums of money and labor went into the construction of the new cabin.

## C.   Damages for Unjust Enrichment

Having been forbidden to reenter the Debtors' real property to make use of his license coupled with an interest, Mr. Kungle asserts that he is entitled to money damages under an unjust enrichment theory of recovery. The parties do not dispute that the value of the Debtors' real property increased as a result of Mr. Kungle's construction of the new cabin, even though the Debtors would rather not have it on their land.

In *Realmark Devs. v. Ranson*, 588 S.E.2d 150, 155 (W. Va. 2003), the Supreme Court of Appeals of West Virginia summarized the proper measure for restitution damages under circumstances where a lessee improved the property of the lessor based on the lessor's representation that the lessor would agree to sell the building to the lessee at the end of the lease term. The Court stated that if "'a sum of money is awarded to protect a party's restitution interest,'" the amount of the restitution award is measured, as justice requires:

8

> "by either (a) the reasonable value to the other party of what he received in terms of what it would have cost him to obtain it from a person in the claimant's position, or (b) the extent to which the other party's property has been increased in value or his other interests advanced. The greater of the above two measures should be used in cases in which work has increased the value of the defendant's property, but there is some discrepancy between the reasonable value of that work and the amount of enhancement."

*Id.* at 155 (*quoting* 22 Am.Jur.2d *Damages* § 56 (1988)); *see also Restatement 1st of Restitution*, § 151 (1937) (noting that the proper measure of damages where a person has been dispossessed of rights under "consciously tortious conduct . . . is the value of the property at the time of its improper acquisition, retention, or disposition . . . ."); *Restatement 3d of Property: Servitudes* § 8.3 (2000) (including restitution as one of the proper measures for awarding damages in a suit to enforce a servitude).

In this case, neither party has elected to submit information regarding the actual costs of the cabin's construction; thus, the only issue is the extent to which the value of the Debtors' property has been increased. According to the *Restatement*, restitution damages are based on "the value of the property at the time of its improper acquisition":

> The value of property is its exchange value measured in money, or the amount for which it could be exchanged if there were an open market with a wide opportunity for buyers. In the case of land there is ordinarily no such market by which the value can be determined, in which case . . . the value must be determined by the opinion of those having such information as gives them a basis for judgment. The fact that the subject matter was of little or no worth to the person obtaining it is not material, nor is the fact that he could have obtained it or an equivalent at a lower price.

*Restatement 1st of Restitution* § 151, cmt. b. (1937).

Consistent with the *Restatement*, the proper measure of restitution damages in this case is the extent to which the construction of the new cabin increased the overall value of the Debtor's real property – not the value of the new cabin to the Debtors, personally, and not compensation for Mr. Kungle's future loss of use.[2]

---

[2] The Debtors argue that under the law of improvements, as set forth in 41 Am Jur. 2d *Improvements* § 17 (2008), the quantum of damages in this case should be measured by the value of the new cabin to the Debtors. In § 19, however, the treatise clarifies that "[r]estitution for improvements to real estate may be a basis for an independent action for unjust enrichment" –

9

Here, Mr. Kungle substantially completed the construction of his new cabin in 1998, and he was effectively evicted from the Debtors' property on November 7, 2004. On August 25, 2007, Mr. Kungle had the new cabin, and the 15 acres on which the new cabin sits, appraised by Larry McDaniel. This appraisal is nearly three years after the Debtors' prohibited Mr. Kungle from entering their land to access the new cabin. Accordingly, the court will not use the value established as of August 25, 2007 as the proper measure of Mr. Kungle's restitution claim. Nevertheless, in an effort to assist the parties in reaching a consensual resolution of this case, the court will examine the parties arguments and ascertain the value of the new cabin as of August 25, 2007.

In his appraisal, Mr. McDaniel assigned $22,500 to the value of the land, and $70,200 to the value of the new cabin based on a sales comparison approach, and, if an income approach was used, $67,000 would be the value of the new cabin considering that its use is for hunting and recreation purposes. In his opinion, the total contributory value of the improvements to the Debtors' real property is $68,000.[3]

In October 2008, the Debtors hired K. Reed Judy to view the new cabin and to evaluate the appraisal prepared by Mr. McDaniel. Mr. Judy generally agreed with Mr. McDaniel's report; however, he did have some concerns. Namely, the new cabin does not have its own water supply, and the cost of a new well would be about $2,500. Mold was found in the basement, and the estimated clean-up costs are $2,000. Finally, the new cabin is located about 0.9 miles from the county road. In Mr. Judy's opinion, the new cabin's remote access makes it unacceptable for daily use, which is a distinguishing characteristic from the sale comparison properties listed by Mr.

---

which is the cause of action and remedy elected by Mr. Kungle in this case. Consequently, the court is resorting to the law of restitution on an unjust enrichment claim to determine the appropriate measure of damages.

[3] According to Mr. Kungle, the Debtors' tax assessment listed the assessed value of the new cabin at $50,000. Mr. Kungle submits that real property is typically assessed at 60% of its actual value, meaning that the taxing authority values the new cabin at $82,000. No indication exists in the record as to the year of the tax assessment, or whether the tax assessment took into consideration the unique features of the new cabin, like the fact that it is located about 0.9 miles from the county road and is not accessible year round. Neither Mr. McDaniel, nor Mr. Judy, the Debtor's appraiser, believes the new cabin is worth $82,000, the tax assessment was not submitted as an exhibit, and, in this case, the court does not afford any weight to the tax assessed value of the new cabin.

10

McDaniel. According to Mr. Judy, remote access would result in a 33% decrease in the $68,000 contributory value determined by Mr. McDaniel.[4] Making allowances for these additional deductions, Mr. Judy believes a sale comparison approach would yield a contributory valuation of $41,060.

Additionally, Mr. Judy states that Mr. McDaniel's determination of the income valuation of the new cabin did not take into consideration overhead costs associated with rental property. In Mr. Judy's view, the income approach valuation of the new cabin was $47,862.

Based on the appraisal of Mr. McDaniel, as analyzed by Mr. Judy, the court believes that the value of the new cabin for purposes of awarding restitution is $45,461 as of August 25, 2007. The court credits Mr. Judy's report over that of Mr. McDaniel because the comparison sales used by Mr. McDaniel were suitable for daily use, whereas the new cabin is not due to its remote location. Also, no indication exists that Mr. McDaniel's comparison properties had a shared well like the new cabin, a factor that would also negatively impact its value in a market sale. The court does not believe it is appropriate to make a $2,000 deduction for mold remediation because there is no indication in the record that mold was present in the new cabin when the Debtor forbid Mr. Kungle further access on November 7, 2004. The court credits Mr. Judy's income valuation analysis over Mr. McDaniel because Mr. McDaniel made no allowance for the overhead costs associated with rental property. The court concludes that the value of the new cabin on August 25, 2007 was $45,461 by taking Mr. Judy's sale comparison value of $41,060, adding back Mr. Judy's $2,000 mold reduction to reach a sales comparison value of $43,060, and then averaging that with Mr. Judy's income valuation of $47,862 to reach a total value of $45,461.

In sum, the new cabin's remote location, shared water system, and limited use as a base for hunting and recreation activities negatively impacts the new cabin's value. Therefore, the court finds that the contributory value of the new cabin to the Debtors' real property is $45,461 as of August 25, 2007.

---

[4] Mr. Kungle argues that Mr. McDaniel did consider the remote location when arriving at a value for the new cabin. In fact, Mr. McDaniel noted that the new cabin's remote access "will have a negative affect upon the value of the site since it appears without question that the unit is overbuilt for its location, access, and general purpose." Although Mr. McDainel made this statement in his report, he did not make any corresponding deduction in the value of the new cabin based on his sale comparison analysis.

11

**D.     Interest**

In addition to seeking restitution based on the increased value to the Debtors' property based on his construction of the new cabin, Mr. Kungle seeks interest on that amount from the time that he was forbidden to reenter the Debtors' real property – November 7, 2004.

As a measure of restitution damages, a party is entitled to interest under the following conditions:

> [A] person who has a duty to pay the value of a benefit which he has received, is also under a duty to pay interest upon such value from the time he committed a breach of duty in failing to make restitution if, and only if:
> (a)  the benefit consisted of a definite sum of money, or
> (b)  the value of the benefit can be ascertained by mathematical calculation . . . by established market prices, or
> (c)  payment of interest is required to avoid injustice.

*Restatement, 1st of Restitution* § 156 (1937).

Under subsection (b), the court has ascertained the value of the benefit to the Debtors of the new cabin to be $45,461 as of August 25, 2007. The record is incomplete regarding the value of the new cabin as of November 7, 2004.

Regarding the appropriate rate of interest, 28 U.S.C. § 1652 requires that state law be regarded as the rules of decision in civil action in federal courts, unless the Constitution, treaty, of federal law requires otherwise.[5] Under West Virginia law, when pre-judgment interest is awarded, the rate is "three percentage points above the Fifth Federal Reserve District secondary discount rate

---

[5] The federal statute regarding the award of interest on judgments is 28 U.S.C. § 1961, which, by its terms, is silent on the award of pre-judgment interest. Under § 1961, a federal court shall allow interest on a money judgment on a civil case calculated from the date of the entry of the judgment, at a "rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." For example, the § 1961 interest rate for the week of February 13, 2009 is 6%. (available at <http://www.federalreserve.gov/releases/h15/current> (visited February 23, 2009)). Given that § 1961 does not expressly govern an award of pre-judgment interest, and that the court is adjudicating the state law rights of the parties, the court does not believe that the § 1961 rate of interest would be an applicable pre-judgment interest rate in this case. *See Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law."); *Hall v. White*, 465 F.3d 587, 595 (5th Cir. 2006) ("Issues regarding pre-judgment interest in a diversity case 'are governed by applicable state law.'").

12

in effect on the second day of January of the year in which the judgment or decree is entered: Provided, That the rate of prejudgment . . . interest shall not exceed eleven percent per annum or be less than seven percent per annum." W. Va. Code § 56-6-31(b).  For judgments entered in 2009, the West Virginia pre-judgment interest rate is 7%. (available at <http://www.state.wv.us/wvsca/rules/rulesindex.htm> (visited Feb. 23, 2009)).

Although an award of pre-judgment interest is required in this case as part of Mr. Kungle's claim for restitution damages, the court is only adjudicating the amount of Mr. Kungle's unsecured proof of claim.  Importantly, in Chapter 13 cases, unsecured claims generally do no accrue interest after the  the filing of the bankruptcy petition.  11 U.S.C. § 502(b)(2) (disallowing claims against the estate to the extent that the claim is for unmatured interest); *Nat'l Energy & Gas Transmission, Inc. v. Liberty Elec. Power, LLC (In re Nat'l Energy & Gas Transmission, Inc.)*, 492 F.3d 297, 301-02 (4th Cir. 2007) (stating that the purpose of § 502(b)(2) "is twofold: (1) the avoidance of unfairness among competing creditors, and (2) the avoidance of administrative inconvenience.").

On the other hand, in a Chapter 7 case, when the liquidation of a debtor's property is sufficient to pay all allowed unsecured claims in full, then an unsecured creditor is entitled to receive interest on a claim before any excess payment is made to the Chapter 7 debtor. 11 U.S.C. § 726(a)(5) (requiring property of the estate to be distributed "in payment of interest at the legal rate from the date of the filing of the petition, on any claim paid [by the Chapter 7 trustee].").  The "legal rate" referred to in § 726(a)(5) is the federal rate as stated in 28 U.S.C. § 1961.  *E.g.*, *Onink v. Cardelucci (In re Cardelucci)*, 285 F.3d 1231, 1235-36 (9th Cir. 2002) ("In bankruptcy, an allowed claim becomes a federal judgment and therefore entitles the holder of the judgment to an award of interest pursuant to federal statute. . . . '[I]nterest at the legal rate' is a statutory term with a definitive meaning . . . ."); 6 *Collier on Bankruptcy*, ¶ 726.02[5] (Alan N. Resnick & Henry J. Sommer eds. 15th ed. rev. 2009) ("The reference in the statute to the 'legal rate' suggests that Congress envisioned a single rate, probably the federal statutory rate for interest on judgments set by 28 U.S.C. § 1961.").

While § 726(a)(5) governs an unsecured creditor's entitlement to post-petition interest, post-confirmation interest in a proposed Chapter 13 plan is determined pursuant to 11 U.S.C. § 1325(a)(4).  *E.g.*, *In re Cook*, 322 B.R. 336, 340 (Bankr. N.D. Ohio 2005) ("Section 726(a)(5) deals with pendency interest – interest accruing after the commencement of the case but before the effective date of the plan. . . . Section 1325(a)(4) [deals with post-confirmation interest]."). Under

11 U.S.C. § 1325(a)(4), one of the confirmation requirements is that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1325(a)(4). As explained more throughly, when a debtor proposes a 100% plan, that the court must:

> capitalize the proposed payments, by converting deferred payments offered the creditor into an equivalent capital sum as of the effective date of the plan. . . . Unless the plan proposes that all payments to unsecured creditors will be made immediately upon the effective date of the plan, the present value language in the section dictates that interest be paid to compensate for the lost time value of the money caused by the deferral of payments. Thus, if a creditor holding an allowed unsecured claim would receive full payment of its claim in a chapter 7 liquidation, a plan would not meet the best interests test unless deferred payments to the creditor paid one hundred percent of the claim plus interest. If the creditor would have received postpetition interest in a chapter 7 case because the debtor is fully solvent, then such interest, running until the effective date of the plan, must also be paid.

8 *Collier on Bankruptcy* ¶ 1325.05[2][b] (Alan N. Resnick & Henry J. Sommer eds. 15th ed. rev 2008).

Interpreting similar language for secured claims under § 1325(a)(5), the United States Supreme Court in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004) determined that the proper method of determining the present value of property to be distributed over the life of the plan was to apply a rate of interest that was equivalent to the prime rate, plus a small risk factor – generally between one and three percent.

Consonant with *Till*, in proposing their Chapter 13 plan, the Debtors must propose an interest rate that will fairly compensate Mr. Kungle for the Debtors' inability to make a lump sum payment to him as of the effective date of their plan. *Accord*, 8 *Collier on Bankruptcy* ¶ 1325.05[2][b] ("The principles followed in calculating present value interest under section 1325(a)(4) should be similar to those followed under section 1325(a)(5), because both sections share the goal of compensating creditors for a delay in payments they would otherwise receive immediately.").

In sum, the court finds that Mr. Kungle is entitled to interest on the value of the new cabin at the West Virginia pre-judgment interest rate of 7% from November 7, 2004 to the date of the filing of the Debtors' Chapter 13 bankruptcy petition on April 17, 2008. The Debtors' current

14

proposed Chapter 13 plan does not provide for the allowed amount of Mr. Kungle's unsecured claim. In amending their plan, the Debtors shall specify the effective date of their plan. Thus, from April 17, 2008 to the effective date of the Debtors' proposed plan, they shall propose to pay interest to Mr. Kungle at the federal judgment rate of 28 U.S.C. § 1961. Assuming that the Debtors can submit a confirmable plan, as of the effective date of that plan, the Debtors shall propose to pay Mr. Kungle a rate of interest equivalent to the prime rate, plus a risk adjustment factor, if appropriate, consistent with *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004).

## CONCLUSION

The court concludes that Mr. Kungle is entitled to an allowed unsecured claim against the Debtors' bankruptcy estate based on his claim for unjust enrichment. The applicable date for measuring Mr. Kungle's claim, and the contributory value of the new cabin, is November 7, 2004. The parties have not submitted any evidence to the court as to the value of the new cabin as of November 7, 2004; however, the court has determined the value of the new cabin as of August 25, 2007, to be $45,461 – based on the submission of the parties – in an effort to assist them in reaching a settlement of this issue without further resort to the court. The court has also outlined the appropriate interest rate calculations once that value has been determined.

The court will enter a separate order scheduling an evidentiary hearing as to the value of the new cabin on November 7, 2004. The parties may avoid the evidentiary hearing by submitting to the court an agreed order setting forth the value of the new cabin as of November 7, 2004, which thereby grants in part and denies in part the Debtors' objection to Mr. Kungle's proof of claim.